***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except for minor modifications.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer.
3. The Carrier on the risk is Specialty Risk Services.
4. The parties submitted a Pre-Trial Agreement which is incorporated herein by reference.
5. The issues before the Deputy Commissioner were (1) Whether plaintiff is entitled to on-going benefits, and (2) Whether plaintiff's psychological condition is related to her original compensable injury. The issue before the Full Commission was whether plaintiff's benefits should have been suspended rather than terminated. Plaintiff did appeal the Deputy Commissioner's conclusion that her psychological issues were not related to the on the job injury.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACTS
1. Plaintiff worked as a CNA for defendant-employer. On February 26, 2001, she sustained a compensable injury by accident arising out of and in the course of her employment while lifting a patient at which time plaintiff injured her back.
2. Plaintiff participated in an exhaustive course of medical treatment. She was initially treated in the emergency room then later treated by Dr. Giedriatis at Miller Orthopedic Clinic, who took plaintiff out of work and recommended a Medrol Dose Pak. He also prescribed Vicadin and physical therapy for two weeks.
3. Plaintiff continued to experience pain symptoms. Her medical history indicated she had poorly controlled diabetes. On April 12, 2001, Dr. Giedriatis indicated that she may have diabetic radiculopathy and asked her to see a neurologist for nerve testing and evaluation. Plaintiff's neurological testing was positive for diabetic radiculopathy. On July 16, 2001, Dr. Giedriatis released plaintiff at maximum medical improvement, issued a 0% rating and no permanent restrictions.
4. Plaintiff continued treatment with Dr. Difini, a neurologist. An MRI of the lumbar spine was normal. A lumbar CT myelogram revealed degenerative changes with disc bulging facet, hypertrophy and ligamentum flavum overgrowth. However, there was no nerve root compression at L4-5 and L5-S1. Dr. Difini diagnosed employee with mild diabetic neuropathy and prescribed Ultrum for pain. On June 28, 2001, Dr. Difini recommended no further neurologic intervention for plaintiff. He suggested that she seek treatment at a pain clinic.
5. Plaintiff was referred to the Rehab Center for pain management. According to Dr. Carlton, a physiatrist at the Rehab Center, the goal of the Rehab Center is to take a team-like approach to managing pain. Plaintiff would not only be treated by Dr. Carlton for medical management of her pain, but also by Dr. O'Malley, a psychologist and a physical therapist.
6. Dr. Carlton first examined plaintiff on September 12, 2001. Plaintiff's complaints of pain were not corroborated by objective testing. Dr. Carlton testified that plaintiff had far more pain and disability that one would normally see from the type of minor injury she suffered.
7. In October 2001, Dr. Carlton recommended that plaintiff participate in a comprehensive pain management and rehabilitation program. On November 13, 2001, prior to plaintiff entering this program, Dr. Murray, a spine surgeon examined her. Dr. Murray diagnosed plaintiff with chronic low back pain, indicated she was not a surgical candidate and did not think that further diagnostic testing would be beneficial. Dr. Murray concurred with Dr. Carlton that a comprehensive pain management rehabilitation program that included physical therapy would be beneficial to plaintiff.
8. Plaintiff began participation in a comprehensive rehabilitation program at the Rehab Center on November 26, 2001. Her participation in this program was interrupted on November 28, 2001 due to a psychiatric break down. She reported to Dr. O'Malley that she engaged in self-mutilating behavior over the weekend and had cut her arms and legs with a knife. Dr. O'Malley suggested that she report to the emergency room at the Community Mental Health Center. Plaintiff was later admitted to the Behavioral Health Center for nine days.
9. During this stay, she attributed feelings of hopelessness to her back injury. She stated her pain was so severe she wanted to kill herself. Her admission diagnosis was major depression without psychotic features. On December 5, 2001, plaintiff was discharged from the Behavioral Health Center. She returned to the comprehensive rehabilitation program on December 6, 2001 and completed this program on January 15, 2002. One week later, plaintiff returned to work light duty and resumed treatment with Dr. Carlton and Dr. O'Malley.
10. When plaintiff returned to work, she could no longer perform all of her duties as a CNA due to the restrictions issued by Dr. Carlton. Rusty Mitchell, who is the Facility Administrator for the defendant-employer, developed a work plan for plaintiff that was within her restrictions. Plaintiff indicated that she did not want to perform any work involving patients directly. Because the CNA job consisted of a significant amount of patient contact, Mr. Mitchell developed a plan which incorporated some housekeeping duties in an effort to minimize plaintiff's contact with patients, as per her request. Plaintiff's title remained "CNA" although she was performing housekeeping tasks. This job description was approved by Dr. Carlton.
11. Plaintiff underwent an independent medical evaluation with Dr. Dickerson of Charlotte Orthopedic Specialists on February 28, 2002. Dr. Dickerson diagnosed lumbar strain with degenerative disc disease and evidence of sciatica. He also noted peripheral neuropathy secondary to diabetes mellitus. Dr. Dickerson indicated plaintiff was not a surgical candidate and issued a 5% disability rating to the back.
12. On March 13, 2002, Dr. Carlton released plaintiff at maximum medical improvement. He issued a 7% permanent partial impairment rating to her back and light duty work restrictions.
13. On August 29, 2002, defendant-employer changed plaintiff's status from a Nursing Department employee to a Housekeeping/Laundry Department employee because she had been working in a light duty capacity for some time and her rehabilitation was not progressing. Plaintiff had reached maximum medical improvement and was issued permanent restrictions. Although plaintiff's wages would be reduced, Mr. Mitchell explained to plaintiff that workers' compensation would make up the difference. Mr. Mitchell explained to plaintiff that if her restrictions were ever lifted, he would happily move her back to the Nursing Department and allow her to resume her position as a CNA.
14. Plaintiff became visibly upset at this suggestion. She was very angry and stated that she had worked so hard not to be in the housekeeping department and she did not want to be a maid. She refused to execute the Employee Change Form acknowledging this change in status.
15. Mr. Mitchell attempted to explain the change in status a second time to plaintiff and obtain her signature on the Employee Change Form. Again, plaintiff became visibly upset and left angry. Later that day, plaintiff's husband appeared in Mr. Mitchell's doorway. He was visibly upset and angry. Mr. Mitchell was on the telephone when he arrived. As he hung up the phone to address the man, plaintiff physically pulled her husband out of the doorway, saying to him, "Come on, don't start anything."
16. On September 19, 2002, plaintiff was standing in Mr. Mitchell's doorway and stated she was having a seizure. She fell to the floor. Plaintiff was admitted to the hospital. No "seizure like activity" was observed during her seven day stay at the hospital. Plaintiff continued with complaints of back pain. An MRI of the lumbar spine was normal. Plaintiff's diabetes was poorly controlled and she was given Insulin. Plaintiff was sent to Behavioral Health for an evaluation.
17. On October 25, 2002, plaintiff presented to the emergency room with suicidal ideations. She was admitted to the Behavioral Health Center for a second time. She complained of chronic back pain and bouts of depression and suicidal ideation, which had been worsening over the past several weeks. She was also having thoughts of overdosing. She reported of hearing the doorbell ringing when it was not and hypnagogic experiences seeing people standing by her bed when she woke up. Dr. Praful Mehta stated that plaintiff's current condition appeared to be related to some situational factors and there was evidence of secondary gain. Plaintiff's blood sugar measures were high and she had not been following her dietary restrictions for her diabetes. Dr. Khan was consulted for plaintiff's diabetic condition. Plaintiff was discharged on November 1, 2002, but continued to follow up with the facility's outpatient program.
18. Plaintiff was readmitted to the Behavioral Health Center for a third time on December 1, 2002 with complaints of helplessness and hopelessness related to her chronic pain. She also reported problems getting along with her supervisor at work and that she was upset she was put in the Housekeeping Department. Again, it was noted that plaintiff's diabetic condition was not well controlled. Dr. Khan made changes in plaintiff's diabetic management. Plaintiff was discharged on December 16, 2002 and was told to continue treatment with Dr. Carlton and Dr. O'Malley.
19. In early January, plaintiff sent two threatening letters to Mr. Mitchell. She threatened to kill Mr. Mitchell and her co-workers. She also threatened to take legal action against Mr. Mitchell.
20. Plaintiff's refusal to accept work in the Housekeeping Department and abusive behavior towards Mr. Mitchell and her co-workers constitutes an unjustified refusal to work. Plaintiff's unwillingness to work in the Housekeeping Department is due to her personal aversion to being labeled a "housekeeper" and is unrelated to her compensable injury and/or resulting restrictions.
21. On January 14, 2003, plaintiff underwent yet another independent medical evaluation with Dr. Murray at Charlotte Orthopedic Specialists. He noted that her symptoms had increased in the right leg and suggested that a spinal cord stimulator might provide some improvement for her leg symptoms, although he did not think that it would help her back symptoms. Dr. Murray found that plaintiff showed some exaggerated pain behaviors and inconsistencies during the exam. He reiterated that plaintiff was not a surgical candidate and that it might be worthwhile for Dr. Miller to evaluate her. Dr. Murray did not change any previous ratings issued or restrictions.
22. On February 19, 2003, plaintiff was seen by Dr. Carlton for a follow up visit. Plaintiff reported that she was doing poorly and tried to get Dr. Carlton to issue her narcotics prescriptions. Dr. Carlton talked to plaintiff and her husband for over an hour. He told her he would not write the prescriptions she wanted. Plaintiff became visibly upset at Dr. Carlton's refusal to write her prescriptions.
23. Dr. Carlton testified that he recommended plaintiff go to the Behavioral Health Center because the type and number of medications she was taking was not a normal combination which he would ordinarily prescribe. He testified that if plaintiff were going to be on that particular regimen, she should be seen by a psychiatrist.
24. Following this visit with Dr. Carlton, plaintiff was admitted to the Behavioral Health Center for a fourth time. During plaintiff's psychiatric exams, she was noted to make extremely exaggerated limping motions and facial grimaces. She also complained of auditory hallucinations although the description of these hallucinations changed throughout the session. Plaintiff repeatedly stated that she was suffering with excruciating pain which was completely overwhelming her and which her practitioners were not treating adequately. However, it was noted that plaintiff demonstrated no signs of depressed mood or changes in manner and that she demonstrated an entirely normal attention span, was oriented fully and her memory was intact.
25. Dr. Dana Castro opined that plaintiff did not have a mental status consistent with a psychotic state and she did not appear particularly distressed despite her statements of being overwhelmed and in agony. During this fourth stay at the Behavioral Health Center, plaintiff underwent multiple examinations which were all suggestive of exaggeration with respect to her complaints of pain. Her complaints of pain were not correlated with any identifiable anatomical abnormalities, or consistent with medical evaluation. Dr. Castro opined that plaintiff was manipulating, with the attempt to obtain secondary gain, in the form of both narcotic medication and possible disability.
26. Dr. Carlton agreed that plaintiff's progression of behavior was not typical of someone who experienced such a minor injury and that plaintiff was exhibiting manipulative behaviors.
27. Dr. O'Malley testified that plaintiff's depression was caused by her workplace injury, however, upon reviewing Dr. Castro's discharge notes, he testified that due to their experience and type of practice, the people at the Behavioral Health Center were in a better position to evaluate patients with plaintiff's problems.
28. The expert testimony presented is conclusive that plaintiff's current psychological condition is not a direct and natural result of her compensable workplace injury. In fact, the expert testimony establishes that plaintiff's complaints of on-going pain and depression are largely fictitious and plaintiff is engaging in such disorder in efforts to avoid returning to work.
29. On April 3, 2003, plaintiff was referred to Dr. Miller at the Southeast Pain Center for an evaluation regarding a spinal cord stimulator. Plaintiff underwent trigger point injections and a trial muscle stimulator. Both the injection and the stimulator provided no relief. On June 6, 2003, Dr. Miller indicated there was nothing more he could do for plaintiff and released her at maximum medical improvement.
30. Plaintiff presents no evidence that she is unable to work at pre-injury wages due to her workplace injury.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Pursuant to N.C. Gen. Stat. § 97-32, plaintiff's refusal to work in the Housekeeping Department and abusive behavior towards her co-workers constitutes an unjustified refusal to work and entitles defendants the right to suspend plaintiff's benefits.
2. Plaintiff does not suffer from a psychological condition as a direct and natural consequence of her workplace injury. Terry v. PPGIndustries, Inc., 156 N.C. App. 512, 577 S.E.2d 326 (2003), cert. den.,
___ N.C. ___, 583 S.E.2d 290 (2003). Therefore, plaintiff is not entitled to benefits related to treatment at the Behavioral Health Center.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. As of the date of the Order of the deputy commissioner, defendants may suspend plaintiff's benefits.
2. Plaintiff's request that defendants pay for expenses associated with her multiple stays at the Behavioral Health Center and related treatment are hereby DENIED.
3. Defendants shall pay the costs due the Commission.
This the 3rd day of March 2005
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DCS/llc